Filed 3/7/14  P. v. Lee CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061235 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. SCD219673) |
| MARCELLUS LOPES LEE et al., | |
| Defendants and Respondents. | |

APPEAL from orders of the Superior Court of San Diego County, Edward P. Allard III, Judge.  Reversed and remanded with instructions.

Bonnie M. Dumanis, District Attorney, Laura E. Tanney, Chief Deputy District Attorney, Gary W. Schons and Valerie M. Ryan, Deputy District Attorneys, for the Plaintiff and Appellant.

Michael J. McCabe and Charles R. Khoury, Jr., for Defendant and Respondent Francisco Jose Martinez, Jr.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Respondent Daniel Paul Romero.

No appearance for Defendant and Respondent Marcellus Lopes Lee.

A jury found Marcellus Lopes Lee, Daniel Paul Romero and Francisco Jose Martinez, Jr. (together, defendants) guilty of fraud in the offer or sale of commodities in violation of Corporations Code section 29536 and grand theft of personal property in violation of Penal Code section 487, subdivision (a).[1]  Lee and Romero were also convicted on charges of conspiracy to defraud another of property.  The jury was unable to reach a verdict on all counts.  The People appeal the trial court's orders granting a new trial on some counts and dismissing some of those counts and others for insufficiency of the evidence.[2]

The People contend the trial court acted in excess of its jurisdiction and abused its discretion when it granted a new trial on defendants' commodities fraud convictions for instructional error; erred when it explicitly rejected section 1385 as authority to dismiss for legal insufficiency of the evidence; erred when it treated dismissed convictions and deadlocked counts as acquittals without having reviewed the record for substantial evidence; and abused its discretion when it dismissed two counts against Martinez under section 1385.

Romero and Martinez[3] (together, respondents) acknowledge that the trial court misunderstood its authority under section 1385 to dismiss charges for insufficiency of the evidence.  They note that the record of the trial court's legal analysis during the three-day hearing on the defendants' motions for new trial is often fragmented and difficult to follow, and

---

[1]    Unless otherwise indicated, further statutory references are to the Penal Code.

[2]    The People do not appeal the trial court's dismissal of Romero's conviction on counts seven (commodities fraud) or its dismissal of the charge against him on count six (grand theft) on which the jury was unable to reach a verdict.  (The jury acquitted Lee and Martinez of those counts.)  In the interests of brevity, we have omitted testimony concerning these counts.

[3]    Lee has not filed a respondent's brief.  Accordingly, in his case, we decide the appeal on the record, the opening brief and oral argument.  (See Cal. Rules of Court, rule 8.360(c)(5)(B).)

claim that the People have taken many of the trial court's remarks out of context. Respondents assert the trial court understood the procedural requirements for dismissal and properly applied the substantial evidence standard. They also contest the People's substantive arguments.

We conclude that the trial court abused its discretion when it granted the motions for new trial on grounds of instructional error. We reject the People's argument the dismissals are invalid because the trial court explicitly stated it was not proceeding under section 1385. However, on this record, we cannot conclude that the trial court otherwise met all requirements to dismiss for legal insufficiency of the evidence under that section. In dismissing the majority of the counts against the defendants for legal insufficiency of the evidence, the trial court did not apply the substantial evidence standard. In those instances where the trial court found that the record contained no evidence to support the jury's verdict, the trial court's review was based on erroneous interpretations of the legal requirements of Corporations Code section 29536 (commodities fraud) and Penal Code section 487 (theft). Accordingly, we reverse the orders of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

From at least April 2004 to September 2006, Lee, Romero, Martinez and others solicited several million dollars from relatives, acquaintances and members of the general public for the purpose of trading off-exchange foreign currency (forex) contracts. They told potential investors they had significant success trading foreign currency and promised high returns and minimal risk through stop-loss[4] discipline. With one exception, investors lost most

---

[4] "Stop-loss" refers to "an order to sell a security or commodity at a specified price in order to limit a loss." (<http://oxforddictionaries.com/us/definition/american_english/stop-loss?>, as of Feb. 3, 2014.)

3

or all of their money. In some instances, defendants used investor funds to repay earlier investors, pay promised rates of return to certain individuals or for personal expenses.

Before they ventured into forex trading, Romero employed Martinez as a sales associate in a retail satellite television business. When that enterprise failed, Romero and Martinez researched business opportunities on the Internet and learned there was significant profit potential in international currency trading. In late 2003, Romero started Kingdom Advisors, Inc. (Kingdom Advisors), a religious, nonprofit corporation. They searched online for a forex trader and located Marcellus Lee, who operated New England Capital Trading, Inc. (NECT). A former stockbroker, Lee started NECT in 2003. He took an introductory online course on foreign currency trading and opened for business in early 2004.

A forex transaction involves the retail customer and a futures commission merchant (FCM),[5] who buy and sell currency on either side of a single transaction relating to the relative value of two different currencies. The FCM can enter into offsetting transactions with another bank or customer to mitigate its risk. It profits by charging a higher price for a particular currency than what it will pay for the same currency. An FCM may also charge fees and per trade commissions. An introducing broker solicits retail customers to open accounts with an FCM. The introducing broker is not a party to the trade but is typically paid a per-trade commission by the FCM.

---

5       "A company acting as a futures commission merchant must register with the Commodit[y] Futures . . . Trading Commission (CFTC), [title] 7 [United States Code section] 6d(a); and once registered, must meet registration requirements, which include maintaining net capital to cover trades and filing monthly financial reports reflecting the company's financial condition." (*United States v. Walsh* (7th Cir. 2013) 723 F.3d 802, 804.)

Forex is an extremely volatile market. Forex traders may use leverage (i.e., borrowed funds) to increase returns. The total amount of money gained from a foreign currency transaction is the same whether it is leveraged or nonleveraged. However, the rate of return increases dramatically on leveraged transactions. For example, if a customer made $1,000 on a $100,000 nonleveraged transaction (i.e., the customer pays the entire $100,000), his rate of return would be one percent. By contrast, the same return on a transaction leveraged at a ratio of 100 to one (i.e., the customer contributes $1,000 of his or her own money and borrows the other $99,000), would be 100 percent. According to an executive with the National Futures Association (NFA),[6] in view of the unpredictable and volatile nature of forex trading, it is inappropriate to guarantee a profit from trading or promise a specific rate of return.

In August 2004, Romero opened an account with an FCM. He acknowledged receiving a risk disclosure statement, which stated: "The placing of certain orders (e.g., 'stop-loss' orders, where permitted under local law, or 'stop-limit' orders) which are intended to limit losses to certain amounts **may not be effective** because market conditions may make it impossible to execute such orders." Notwithstanding this advisory, Kingdom Advisors's Web site stated, "Investors may lower their exposure to risk by employing risk-reducing strategies such as 'stop-loss' or 'limit' orders."

Romero and Martinez solicited and received more than $600,000 in loans from two individuals to start trading. Using Lee as a trader, they had highly favorable returns for three to five months and were able to recruit other investors. After the initial period, Lee began to incur large trading losses. Romero and Martinez discovered that in addition to his contractual

---

[6] The NFA is a private nonprofit entity formed for the purpose of regulating its members. It is overseen by the CFTC, a government agency.

share of the profits, Lee also received a commission on every trade. From August to November 2005, NECT received a total of $211,654 from its trading accounts. Of those funds, Lee personally received approximately $62,253, Romero personally received $10,127 and Kingdom Advisors received approximately $91,721.

Kingdom Advisors opened its own trading account with Gain Capital (Gain), an FCM, and received commissions or rebates on every trade regardless of performance. Romero and Martinez stopped using Lee's services and contracted with another trader, Josh Nyland. Nyland was not successful. Kingdom Advisors's clients lost most or all of their money. However, according to Romero's estimates, during a period of 16 to 18 months, Gain paid Kingdom Advisors from 10 to 30 percent of several million dollars in commissions.

In approximately late 2005, Romero and Martinez, along with Lee, decided to stop trading in the forex market and start an FCM, known as TradeCo. They told existing clients the only way to recoup their losses was to invest in TradeCo. They solicited other persons to finance their new enterprise by promising high rates of return and the possibility of equity positions. After operating for two to three months, the NFA increased TradeCo's capitalization requirements and TradeCo ceased functioning.

On March 25, 2009, the People charged Lee, Romero, Martinez and two other defendants[7] with conspiracy to defraud, commodities fraud and grand theft for operating an investment scheme involving forex trading. The People alleged defendants falsely claimed substantial expertise and success trading foreign currency, promised returns of 10 to 15 percent

---

[7] The People did not go forward with its case against a defendant who was institutionalized with dementia. At the close of the People's case-in-chief, the trial court dismissed the charges against another defendant, Bethe Anne Strickland. In the interests of brevity, we omit the evidence in the record relating to the charges against Strickland.

per month on investment funds and guaranteed that investors would not lose more than 20 percent of the initial value of their portfolio through the use of stop-loss mechanisms. As a result of their misrepresentations, defendants took more than 2.4 million dollars from individual victims, who lost most or all of their investments.

Trial began on February 28, 2011, and concluded on April 6, 2011. David Shemtov[8] and Djamshid Younessi,[9] business partners who had opened individual trading accounts with NECT, testified at trial. Lee told Shemtov and Younessi that he could produce returns of three percent a month or 25 to 30 percent a year and that the use of a stop-loss mechanism would ensure that only a small percentage of any investment would be at risk during a trade. Lee said he knew the forex business. His clients were very successful. Shemtov spoke with Romero a number of times about investing. Romero said he had successfully used Lee as a trader.

In July 2004, relying on representations concerning the stop-loss provisions and rate of return, Shemtov and Younessi each deposited $50,000 in separate trading accounts and authorized Lee to trade those accounts. Within a week to 10 days, each investment had lost more than 50 percent of its value.

Shemtov contacted Romero, and Romero encouraged him to keep trading and asked him to wait six to eight months to allow them to make enough money to refund his investment. Lee said he had made a bad decision on one trade and Shemtov could not recover his money

---

[8]     With respect to Shemtov, Lee and Romero were charged with one count of grand theft in violation of section 487, subdivision (a) (grand theft; count two) and one count of fraud in the offer or sale of commodity in violation of Corporations Code section 29536 (commodities fraud; count three).

[9]     With respect to Younessi, Lee was charged with one count of grand theft (count four) and one count of fraud in the offer or sale of commodity (count five). )

unless he continued to trade. Shemtov closed his account and withdrew the remaining funds ($19,463.49). Romero sent $2,000 to Shemtov to reimburse him for his losses. In May 2005, after Romero and Lee refused to provide any additional compensation, Shemtov filed a complaint with the California Department of Corporations (CDC).

Younessi testified that the concept of stop-loss was "absolutely" important to his decision to invest with Lee. He was led to believe a stop-loss could limit his losses to a maximum of $1,000 to $2,000 per trade. He later learned a one percent swing in the currency market was enough to wipe out an investor's total equity. Lee told him the loss was "one of those things that happens once in a century" and advised him to keep trading to recoup his losses.

After authorizing more trading, Younessi became aware of additional losses and withdrew the balance of his account ($24,842.40). Younessi testified, "The losses were very sudden, very sudden. And it showed me that the risk taken was in no way compatible with what I was told the risk could be per trade. . . . [¶] . . . [¶] [Lee] took $25,000 of my money; he got two and a half million dollars credit from the bank, without thinking for one minute that [a] one percent swing can wipe me out of $25,000." Younessi viewed the experience as a bad, if not stupid, business decision on his part. He did not want to waste his time trying to recover his investment. However, his business partner, Shemtov, felt strongly about trying to recover his money and Younessi filed a complaint with the CDC.

Brian Smith (Smith)[10] was a certified, licensed financial advisor who became interested in forex for his clients. He testified that he was aware that forex trading "was high risk, very fast, very, very liquid." In late 2004 or early 2005, Smith met with Romero and Martinez to discuss their program. Romero said they could provide a monthly return of six percent. They had clients who were earning that rate.

In view of what he knew about the currency market and leverage, Smith believed it was possible to obtain a high rate of return using leverage. Leverage could multiply returns but it also multiplied risk. Smith sought a means to mitigate that risk. Before investing, Smith met with Lee, Romero and Martinez to learn more about their trading program, including their trading disciplines. Smith and Lee discussed foreign currency markets, liquidity leverage, technology and stop-loss as risk mitigation in technical terms. They had a thorough discussion of stop-loss discipline. Smith knew it was possible to lose all one's money without a risk discipline. However, the strategies Lee described for managing risk included stop-loss discipline and were very reassuring. According to Smith, he invested three groups of funds. The first was his client Robert M. Smith's[11] money, the second was investor funds that were invested in a forex trading account at Gain, and the third was $75,000 that was invested in TradeCo.

---

10    With respect to Smith, Lee, Martinez and Romero were each charged with one count of grand theft (count ten) and one count of commodities fraud (count eleven).

11    To avoid confusion, we refer to Brian Smith as "Smith" and Robert Smith as "Robert." We intend no disrespect to Robert Smith by the use of his first name.

Smith testified that his friend and client, Robert,[12] was looking for a very aggressive investment. Smith discussed what he had learned from Lee, Romero and Martinez with Robert. He recommended to Robert that he invest with them based on the protection afforded to his principal and the very high rate of return.

In November 2004, Robert invested $100,000 with Kingdom Advisors. He received six percent a month for three or four months. Kingdom Advisors did not provide any account or trade summaries. When Kingdom Advisors stopped sending checks, Smith kept communicating with Romero, who assured him Robert's principal was intact and profits would resume. Robert received one or two payments in the third quarter of 2005. Smith never learned what happened to Robert's principal.

Forensic accounting showed that Robert's funds were commingled in a Kingdom Advisors trading account where NECT had trading authority. The total initial balance was $478,385. Of that amount, there were trading losses of $149,630.50 and withdrawals of $328,754.50. The withdrawals included payments of $78,638 to Kingdom Advisors, $15,000 to Martinez, $11,000 to Martinez's organization, Luz de Vida, and transfers totaling $53,000 to Romero's personal bank account. A $5,000 payment to Robert in April 2005 came from a different source of funding from another investor's account.

During the time the defendants' forex trading enterprise appeared to be profitable, Smith created Olympia Capital Management (Olympia). Smith believed he could build a workable partnership with the defendants as an introducing broker. In 2005, six investors gave Smith a total of $460,000, which he invested with the defendants. A few weeks later, the account

[12]     Lee, Martinez and Romero were charged with one count of grand theft (count eight) and one count of commodities fraud (count nine) with respect to Robert.

suffered losses of approximately 70 percent. Smith contacted Romero, who blamed the trading loss on a young man named Josh Nyland. Smith had met Nyland but did not expect him to have any direct role in trading his accounts. After Nyland suffered initial trading losses, he abandoned stop-loss discipline in hopes of recovering the funds, compounding the losses. Smith said it was a classic mistake by an inexperienced trader.

Smith met with Romero and Martinez, who said Smith could recover his assets by investing in TradeCo. Martinez told Smith they could provide seven percent interest a month while maintaining safety on the principal. Smith invested the funds remaining in his trading account in TradeCo and never learned what happened to those funds.

The forensic accountant tracked the funds invested by each of Smith's investors separately.[13] In June 2005, Jeremy Connelly deposited $10,000 in a Kingdom Advisors bank account. That $10,000, along with other deposits, was withdrawn in various transactions that same month. Kingdom Advisors received $4,300 of Connelly's money, of which $2,500 went to Romero's personal account. Between February and June 2006, Connelly received approximately $3,000 in payments from Olympia.

In November 2005, Michael Mauk deposited $100,000 with Olympia, which was wired to a trading account where Kingdom Advisors had trading authority. The trading account had losses of $69,514 in two months, including commissions. From November 28, 2005 to January 26, 2006, Kingdom Advisors received approximately $63,500 in payments from the trading account. Romero received $9,500. Four thousand dollars was transferred to Romero's

---

13    Defendants were initially charged with separate counts of theft and commodities fraud for each investor with Smith. The trial court consolidated the charges.

failed satellite television business account. There is no record of any funds being returned to Mauk.

Curtis Brown deposited $45,000 with Olympia in November 2005. A month later, Brown's funds were deposited in a trading account. There were transfers from the trading account to Olympia in February, May and June 2006 totaling $34,076.76. Those funds became part of a $75,000 deposit from Olympia to Kingdom Advisors in July 2006. Of those funds, $69,000 was deposited in a TradeCo bank account. The remaining $6,000 was used to pay part of a settlement in a civil lawsuit to a third party. Brown eventually received $26,726.

Greg Hughes deposited $10,000 with Olympia in March 2006. Those funds, together with Greg Sabal's $100,000 deposit, were distributed as follows: In May, $30,000 was placed in a trading account; $35,000 was transferred to a Kingdom Advisors bank account; and in July the rest was included in the $75,000 transfer to Kingdom Advisors. Funds from the $35,000 transfer were used for a $24,500 payment to Hoehn Motors on Romero's behalf. Other payments were made to Disney Resort, credit cards, airlines, hotels and restaurants, and another client's trust account. In August, $24,730 was sent from the trading account to Olympia. Those funds, as well as Paul Cannon's funds (see below), were the source of payments to Kingdom Advisors in September in the amounts of $90,000 and $50,000.

In September 2006, Cannon deposited a total of $152,600 with Olympia. His funds comprised a large portion of $140,000 that went to Kingdom Advisors. A $10,000 check made out to Daniel Romero's wife, Tabitha, was deposited in Romero's personal account. Olympia made payments of $2,000 and $1,000 to Cannon in 2007. Cannon's money was never invested in any trading account.

12

Ricky Lutz[14] was a bank loan officer with 22 years of experience. In early 2005, Lutz contacted Romero for information about forex. Romero sent him a brochure stating that Kingdom Advisors had returns of 10 to 14 percent a month. The brochure stated "the investment manager has established a stop-loss policy with authorized traders such that they are to cease trading should any account suffer a 20 percent loss below the series' most recent highest asset valuation."

Lutz spoke to Lee on numerous occasions. They talked a lot about stop-loss. Lutz understood that traders kept 15 to 20 percent of all trading profits. There were no other fees or charges. If the investment funds dropped below 80 percent of their original amount, trading would stop and the investor would be notified. Lee showed Lutz returns showing that investors had doubled their money in eight months. Lutz knew that a forex investor could make a lot of money and could lose a lot of money. That was why he was "such a stickler" about the stop-loss provision. Losing 20 percent was the worst case scenario.

Relying "100 percent" on Lee and Romero's representations, Lutz recruited four other investors. Together, they invested $260,000 with Lee and Romero in August and September 2005. In early September, Lee sent Lutz an e-mail stating the investment was up 67 percent. Approximately three weeks later, Lutz learned that one of his accounts had lost more than 50 percent of its initial value and another account was down approximately 40 percent. Lutz told Lee he was in violation of their agreement and demanded that Lee restore the accounts to 80 percent of their original value. Lee said the lack of notice to Lutz at the 20 percent mark was

---

14    Lee and Romero were charged with grand theft (count twelve) and commodities fraud (count thirteen) with respect to Lutz.

13

an oversight. He had some safer, small trades that would bring the account balances back to their original amounts. Lutz authorized Lee to continue trading.

On October 12, 2005, Lutz told Lee to close his accounts and return the balances totaling $105,000 to him. On November 6, Lee notified Lutz he had closed the trading account and was ending his forex trading career. Lee said Lutz's account was down approximately 90 percent but he had a solution that would help them both succeed. He asked Lutz to invest his investors' remaining funds ($24,162) in his new FCM, TradeCo, promised to return the expected profits on his original investment, and asked Lutz to invest additional funds in TradeCo. After declining Lee's offer, Lutz received a payment of $24,162, which he returned to one of his investors. He filed a complaint with the CFTC.

Forensic accounting showed Lutz deposited $145,000 in two trading accounts in August 2005. Those funds were not commingled. Between August and November 2005, there were trading losses of $130,436, including commissions and fees, and withdrawals of $14,564 from those two accounts. In August and September, Lutz deposited another $115,000 in other trading accounts, which was commingled with other funds. Between August and November 2005, there were trading losses of $269,588 in those accounts, including commissions and fees, and withdrawals of $18,838.

Martinez testified on his own behalf. He said Lee was very successful trading for three to five months. Martinez was not responsible for the way trades were conducted. He did not have access to trading accounts or records. He did not have any authority over the disbursement of funds from Kingdom Advisors. Martinez said he did not misrepresent Kingdom Advisors's success to any prospective clients or guarantee that a client would not lose

14

his or her investment. Martinez confronted Romero about his use of Kingdom Advisors funds. Romero had built a pool at his home, and purchased a Porsche and a BMW, all-terrain vehicles, a trailer and jewelry. Martinez was vice president of Kingdom Advisors, a partner in TradeCo, but he did not have an ownership interest in the company. Martinez acknowledged that he had signatory authority for Kingdom Advisors's bank accounts and signed documents as the vice president of Kingdom Advisors. He had trading authority over the accounts.

Romero testified that when he spoke to potential clients, he simply relayed his experience in the market during the early months of trading. He promised "best efforts" but never guaranteed a specific rate of return. Romero was not responsible for Kingdom Advisors's Web site, which stated that stop-loss discipline would be used to limit losses. Martinez developed the Web site. Its content came from Gain. Any guarantees on stop-loss were made through Gain.

After deliberating for more than a week, the jury found Lee guilty of conspiracy (count one), commodities fraud (counts nine, eleven and thirteen) and grand theft (count twelve) but was unable to reach a verdict on two other counts of commodities fraud (counts three and five) and four other counts of grand theft (counts two, four, eight and ten).

The jury convicted Romero on charges of conspiracy (count one), commodities fraud (counts eight, ten and twelve) and grand theft (counts seven, nine, eleven and thirteen). It was unable to reach a verdict on one count of commodities fraud (count two) and one count of grand theft (count three).

The jury found Martinez guilty of commodities fraud (counts nine and eleven). It was unable to reach a verdict on two counts of grand theft (counts eight and ten). As to all

15

defendants, the jury made true findings on three white collar penalty enhancements under sections 186.11 and 12022.6.

The defendants filed motions for new trial under section 1181, subdivision (6) (hereafter section 1181(6)) on the ground there was insufficient evidence to support the verdicts. In discussing the motions prior to the formal hearing,[15] the court and parties raised a number of issues requiring further briefing, including whether a new trial should be granted on the commodities fraud counts, or the charges dismissed under section 1385, because the court did not provide the jury with instructions on juror unanimity and what constitutes a "material fact," and whether the jury could properly convict Martinez of commodities fraud on an adoptive admissions theory. Martinez filed a brief arguing that a new trial was required on grounds of instructional error under section 1181, subdivision (5) (hereafter section 1181(5)). Lee and Romero joined in his argument. The People responded.

The hearing on the motions for new trial was held on November 2, 3 and 4, 2011. The trial court dismissed counts two, three, four and five (Shemtov-Younessi counts), finding there was insufficient evidence to show those counts were filed within the four-year statute of limitations. It granted a new trial on the remaining counts of commodities fraud (counts nine, eleven and thirteen) because it had failed to instruct the jury on unanimity and the legal definition of the term "material."

The trial court dismissed the defendants' convictions on count nine for insufficiency of the evidence, reasoning that the victim's testimony was necessary to show that he relied on

---

[15] The record transcripts from the earlier hearings are not included in the record on appeal. Information concerning the earlier hearings is from the trial court's remarks at the hearing on the new trial motions.

defendants' untrue statements about material facts. It also dismissed Lee's and Romero's convictions on count thirteen because there was insufficient evidence in the record to show they made any materially false statements to the victim.

The trial court dismissed Martinez's conviction on count eleven, stating "the record [was] void" of evidence to show that the victim relied on any material false statement by Martinez. When asked by Martinez's counsel whether the ruling on count eleven was made under section 1385, the trial court said, "No. [¶] . . . [¶] In fact, all of my rulings thus far on counts [two], [three], [four], [five], [nine] and [eleven] are on the issue of sufficiency."

The trial court dismissed deadlocked counts one and ten as to Martinez for insufficiency of the evidence and, alternatively, in the interests of justice under section 1385. The trial court dismissed counts eight and twelve on grounds of insufficient evidence to show theft-by-trick or embezzlement.

At the close of the hearing for new trial, Lee was convicted of conspiracy and faced retrial on one count of grand theft (count ten) and two counts of commodities fraud (counts nine and eleven).[16] The court left intact Romero's convictions on charges of conspiracy and

---

[16] The minute order of November 2, 2011, states that Lee's motion for a new trial on counts one, nine, eleven, twelve and thirteen was granted. The record transcript shows that the trial court did not grant Lee's motion for new trial on counts one and twelve. A record that is in conflict will be harmonized if possible. If it cannot be harmonized, the portion of the record that will prevail against contrary statements in another portion of the record will depend on the circumstances of each particular case. (*People v. Harrison* (2005) 35 Cal.4th 208, 226.) The minute order of November 4, 2011, states, "The Court makes a record that Defendant Lee has been found guilty of Count [one] by jury verdict . . . ." The trial court dismissed count twelve on other grounds. The record transcript prevails over the clerk's minutes. Accordingly, the erroneous statement in the November 2, 2011, minute order concerning a new trial on counts one and twelve is of no effect.

grand theft (count ten), and granted his request for a new trial on commodities fraud (count eleven). Martinez's convictions were dismissed. He was not subject to retrial on any counts.

## DISCUSSION

## I

## GRANT OF NEW TRIAL FOR INSTRUCTIONAL ERROR

## A

### *The Parties' Contentions*

The People contend the court erred as a matter of law when it granted a new trial on the defendants' convictions for commodities fraud (counts nine, eleven and thirteen) on the ground of instructional error. They argue the defendants did not raise instructional error in their motions for a new trial and the court did not have the authority to grant a new trial on that ground sua sponte. The People further argue the court had no duty to give a unanimity instruction or provide a definition of the term "material" to the jury.

Respondents contend the People forfeited their claim of procedural error under section 1181 when they did not object to the court's request for briefing on instructional error under section 1181(5) and in fact briefed the issue prior to the hearing on the motions for new trial. Respondents further contend the trial court did not abuse its discretion when it concluded it was required to instruct the jury on unanimity and define the term "material," and its failure to do so was not harmless error.

18

B

*Statutory Framework for Motion for New Trial and Standard of Review*

"A criminal defendant may move for a new trial on specified grounds (§ 1181)." (*People v. Ault* (2004) 33 Cal.4th 1250, 1260.)  Those specified grounds include, as relevant here, when "the court has misdirected the jury in a matter of law[] or has erred in the decision of any question of law arising during the course of the trial . . . ."  (§ 1181(5).)

"A motion for new trial may be granted only upon a ground raised in the motion." (*People v. Masotti* (2008) 163 Cal.App.4th 504, 508.)  A defendant forfeits any claim of error on appeal based on a specific argument the defendant did not raise in his or her motion for new trial.  (*People v. Verdugo* (2010) 50 Cal.4th 263, 309; *Masotti*, at p. 508 [allowing court to grant a new trial on a ground not raised by the moving party would be the equivalent of allowing the court to grant a new trial on its own motion, an act which exceeds its authority]; see *People v. Clark* (2011) 52 Cal.4th 856, 979, fn. 36 [trial court has no authority to grant a new trial on grounds not raised by defendant in his or her motion for new trial].)

A trial court should grant a mistrial only when a defendant's chances of receiving a fair trial have been irreparably damaged.  (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 308; *People v. Clark*, *supra*, 52 Cal.4th at p. 990.)  Before ordering a case retried, the trial court must make its independent determination, under article VI, section 13 of the California Constitution, that error occurred and the error prevented the complaining party from receiving a fair trial.  The trial court has no discretion to award a new trial where no prejudicial error occurred.  (*People v. Ault*, *supra*, 33 Cal.4th at pp. 1262-1263.)  The trial court's ruling on a new trial motion will

19

be disturbed only for clear abuse of discretion. (*Id.* at p. 1260.) However, "assertions of instructional error are reviewed de novo." (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838.)

C

*Claim That the Trial Court Exceeded Its Authority When It Granted a New Trial on Grounds of Instructional Error*

The People contend the defendants' motions for new trial were made pursuant to section 1181(6) on the ground that the verdicts were contrary to law or evidence, and trial court acted in excess of its authority when it raised claims sua sponte under section 1181(5) on grounds of instructional error and then granted the new trial motions on those grounds. On November 2, 2011, at the beginning of the hearing on the motions for new trial, the trial court stated, "As everybody knows, this matter was continued until today's date. The Court and the parties had raised a number of issues that the Court believed required additional briefing in this matter . . . . In that regard, I did in fact receive additional pleadings . . . on behalf of the . . . People[] and . . . Mr. Martinez."

The record shows Martinez filed a brief arguing that a new trial was required on grounds of instructional error under section 1181(5), Lee and Romero joined in his argument and the People responded. At the hearing on the motions for new trial, the People did not object to the trial court's consideration of and ruling on the section 1181(5) issues. Thus they have forfeited their claim of procedural error on appeal. (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 221-222.)

Even if the issue were not forfeited on appeal, the appellate record does not contain the record transcript of the hearing or hearings at which the court and parties discussed the motion for new trial prior to the hearing on that motion. Appellant's failure to provide an adequate

20

record on an issue requires that the issue be resolved against the appellant. (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502; see *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 [the party challenging the judgment has burden of showing reversible error by an adequate record].) The record does not show whether the court or a party raised the issue of instructional error. Because the People have not met their burden to provide an adequate record, they cannot prevail on their claim the court exceeded its authority in granting the motions for new trial on grounds of instructional error.

D

*Claims of Instructional Error*

Corporations Code section 29536, subdivision (b) prohibits any person, directly or indirectly, in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity to willfully make any false report, enter any false record, make any untrue statement of a *material* fact, or omit to state a *material* fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. The trial court granted the defendants' motions for new trial on commodities fraud because it did not give the jury the legal definition of the term "material."

Relying on Model Federal Criminal Jury Instructions defining "a material fact" for purposes of securities fraud,[17] the trial court found that the jury must be provided some guidance on the legal definition of materiality. The trial court said it properly instructed the jury that the untrue statement had to be material but failed to provide the legal definition of the

---

[17]    (See, e.g., *United States v. Smith* (9th Cir. 1998) 155 F.3d 1051, 1063.)

term "material" to the jury. The trial court concluded that the error was not harmless because the charging document did not refer to any particular "statement-slash-fact" and therefore the trial court could not determine whether any statement the jury found untrue was in fact material.

The trial court also decided that a juror unanimity instruction was required because the People alleged in a single count that the defendant made multiple materially false statements. In order to convict a defendant of commodities fraud, the jury was required to unanimously agree on at least one of the false statements. The trial court ruled that the jury had no guidance on whether the theory underlying the commodities fraud charges was the making of a false report, a false record or an untrue statement of material fact. The trial court found that the error was clearly not harmless and granted a new trial on defendants' convictions for commodities fraud.

1.      *Materiality*

The People contend the trial court had no duty to define materiality because there is no legal definition of the term within Corporations Code section 29536 or other relevant statutes. They argue the term "material" is commonly understood to mean "having real importance or great consequence" and does not have a technical meaning peculiar to commodities fraud that would require the trial court to define the term for the jury. (See *People v. Richie* (1994) 28 Cal.App.4th 1347, 1360.) Alternatively, the People contend the trial court abused its discretion when it determined the error was not harmless.

Respondents counter that in the context of commodities fraud, "material" does not merely mean important or significant. Relying on state and federal securities fraud cases, they

22

argue the trial court was required to instruct the jury "a fact is material if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision." (See *Basic Inc*. *v*. *Levinson* (1988) 485 U.S. 224, 231; *People v*. *Butler* (2012) 212 Cal.App.4th 404, 421 (*Butler*); *Insurance Underwriters Clearing House, Inc. v. Natomas Co.* (1986) 184 Cal.App.3d 1520, 1526; *Persson v*. *Smart Inventions, Inc*. (2005) 125 Cal.App.4th 1141, 1163.) Respondents further contend the trial court did not clearly abuse its discretion when it found that the instructional error was not harmless.

Assuming, without deciding, the term "material," as used in Corporations Code section 29536, has a technical meaning peculiar to the law and requires jury instruction, we conclude that the trial court abused its discretion when it determined that its failure to give such an instruction was prejudicial error. The People presented evidence showing that the defendants falsely claimed substantial expertise and success trading foreign currency, promised returns of 10 to 15 percent per month on investment funds, and guaranteed that investors would not lose more than 20 percent of the initial value of their portfolio through the use of stop-loss mechanisms. Although no California appellate court has previously addressed this issue, federal courts considering claims of commodities fraud have held that statements pertaining to expertise and success in trading, rate of return and risk are material facts. (*CFTC v. International Financial Services (New York), Inc.* (S.D.N.Y. 2004) 323 F.Supp.2d 482, 501, 499-500, 502-503 (*IFS, Inc.*) ["misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law"; false representations regarding a broker's expertise are material]; see also *CFTC v*. *Vartuli* (2000) 228 F.3d 94, 102 [misrepresentations as to experience of a particular commodities trader and

23

the degree of risk involved in the highly speculative venture of commodities trading constitute fraud].)  We agree.  Any fact that enables customers to independently assess the risk inherent in their investment and the likelihood of profit is a material fact.  (See *CFTC v. Matrix Trading Group, Inc.* (S.D.Fla. Oct. 3, 2002, No. 00-8880-CIV-ZLOCH) [2002-2003 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943, at 44, 563-64 (CFTC Jan. 14, 1997); see also *CFTC v. Arrington* (D.Neb., Jan. 28, 2014, No. 8:11CV181) 2014 U.S. Dist. LEXIS 10203.)  Here, the alleged statements concerned expertise and success in trading, rate of return and risk and were therefore material.

In addition, the record does not indicate the jury had any problems with the meaning of the term "material" when it convicted the defendants of commodities fraud.  The record contains ample evidence to show the defendants misrepresented their expertise in forex trading, the success of that trading, rates of return for earlier investors, their strategies for minimizing risk and the investors' exposure to risk.  The jury could conclude that the experience and training of the foreign currency trader, his or her strategies for minimizing risk and the accuracy of representations regarding past customer gains and losses were " 'important in making an investment decision' " and therefore material.  (See *IFS*, *Inc*., *supra*, 323 F.Supp.2d at pp. 500, 499, 501-503.)  We conclude that the trial court abused its discretion when it determined the jury could have based its verdict on a nonmaterial fact and therefore the instructional error was not harmless.

2.    *Unanimity*

The People argue the trial court erred when it granted a new trial on the ground it was required to instruct the jury it had to unanimously agree on the particular statement that

24

constituted commodities fraud. The People contend the defendants' representations and actions comprise a continuous course of conduct for which no unanimity instruction is required. The People also maintain that the trial court did not articulate and correctly apply the required harmless error analysis.

Respondents argue a unanimity instruction was required because the People presented evidence of many different alleged acts in violation of Corporations Code section 29536, including promising the victims a large rate of return, implementation of stop-loss to prevent large losses, using marketing materials based on an inaccurate evaluation of past performance, not disclosing losses by earlier investors, misstating their expertise in forex trading and, in the case of Smith, using a less experienced trader than Lee. Respondents contend there is no unitary defense to the alleged acts, and they do not constitute a continuous course of conduct.

In a criminal case, the jury must agree unanimously that the defendant is guilty of a *specific* crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) When the evidence suggests more than one discrete crime, the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. (*Ibid*.) This requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid*., quoting *People v. Sutherland* (1993) 17 Cal.App.4th 602, 612.)

The trial court misinterpreted the law in concluding it was required to give a unanimity instruction to guide the jury on the theory underlying the commodities fraud charges, whether it was the making of a false report, a false record, or an untrue statement of material fact. Here the evidence does not suggest more than one discrete crime. (*Russo*, *supra*, 25 Cal.4th at

25

p. 1132.) Jurors need not be unanimous as to a particular theory of liability so long as they are unanimous that the defendant has committed the underlying substantive offense. (*People v. Davis* (1992) 8 Cal.App.4th 28, 44, 45 [where there is a single offense and a single charge, it is the task of each juror to conclude, based perhaps on very different theories, whether defendant is guilty or not guilty].) Nothing in the record suggests the jury may have been confused by the charges, nor do respondents offer any evidence to suggest this was the case. The jurors were not required to agree on the particular misrepresentations or omissions they relied on for the convictions because that finding merely relates to the manner of committing the crime. (*Butler*, *supra*, 212 Cal.App.4th at p. 426.) A decision that rests on an error of law constitutes an abuse of discretion. (*Carrillo v. Superior Court* (2006) 145 Cal.App.4th 1511, 1523-1524.) We conclude that the trial court abused its discretion when it granted a new trial on defendants' convictions for commodities fraud.

II

POSTTRIAL DISMISSAL OF CRIMINAL CHARGES

A

*Legal Principles*

The double jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall " 'be subject for the same offense to be twice put in jeopardy of life or limb . . . .' " (*People v. Santamaria* (1994) 8 Cal.4th 903, 910; see also Cal. Const., art. I, § 15 [" 'Persons may not twice be put in jeopardy for the same offense . . . .' "].) " '[T]he Double Jeopardy Clause bars retrial following a court-decreed acquittal, even if the acquittal is 'based upon an egregiously erroneous foundation.' " (*Evans v. Michigan* (2013) 133 S.Ct.

26

1069, 1074 (*Evans*), quoting *Fong Foo v. United States* (1962) 369 U.S. 141, 143.) The United States Supreme Court has long held that a verdict of acquittal cannot be reviewed on appeal, on error or otherwise, without putting a defendant twice in jeopardy and thereby violating the Constitution. (*Evans*, at p. 1074, citing *United States v. Ball* (1896) 163 U.S. 662, 671.) However, if a court grants a motion to acquit after the jury has convicted, there is no double jeopardy barrier to an appeal by the government from the court's acquittal, because reversal would result in reinstatement of the jury verdict of guilt, not a new trial. (*Evans*, at p. 1081, fn. 9.)

Section 1385 permits a trial court, on its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, to order an action to be dismissed. A dismissal for legal insufficiency is in furtherance of justice. (*People v. Hatch* (2000) 22 Cal.4th 260, 268 (*Hatch*).) By contrast, "a court has no authority to grant an acquittal in connection with [a section] 1181 [new trial] motion." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133 (*Porter*).) Nevertheless, a defect in the form of the motion should not be construed to undermine the trial court's duty to protect the fundamental rights of the accused. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582 (*Fosselman*).) An acquittal encompasses any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense, including a ruling by the court the evidence is insufficient to convict, a factual finding that necessarily establishes the defendant's lack of criminal culpability and any other ruling relating to the ultimate question of guilt or innocence. (*Evans*, *supra*, 133 S.Ct. at pp. 1074-1075; see *Burks v. United States* (1978) 437 U.S. 1, 16-18, 10 [trial court's ruling of legal insufficiency is functionally equivalent to an acquittal and bars retrial]; *Sanabria v. United States* (1978) 437

27

U.S. 54, 71 [an acquittal is a resolution, correct or not, of some or all of the factual elements of the offense charged].)

A dismissal will be construed as being based on legally insufficient evidence only if "the record clearly indicates that the trial court applied the substantial evidence standard." (*Hatch*, *supra*, 22 Cal.4th at p. 273.) "Specifically, the record must show that the court viewed the evidence in the light most favorable to the prosecution and concluded that no reasonable trier of fact could find guilt beyond a reasonable doubt. [Citation.] Absent such a showing, we will assume the court did *not* intend to dismiss for legal insufficiency and foreclose reprosecution." (*Ibid.*)

A trial court's review for legal insufficiency of the evidence under section 1385 is not the same as its review of the evidence "thirteenth juror" in a new trial motion under section 1181(6). (*People v. Salgado* (2001) 88 Cal.App.4th 5, 9-10 (*Salgado*).) As a thirteenth juror, the trial court independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt to the judge. (*Id.* at p. 10; *Porter*, *supra*, 47 Cal.4th at p. 133.) When the trial court disagrees with the jury's resolution of conflicting evidence and concludes that a guilty verdict is against the weight of the evidence, reversal or dismissal on that ground does not bar retrial. (*Hatch*, *supra*, 22 Cal.4th at p. 272; *Tibbs v. Florida* (1982) 457 U.S. 31, 42, 45, fn. 22, 46.)

If the trial court has dismissed a conviction for legal insufficiency of the evidence, the reviewing court engages in precisely the same task as the trial court and determines, without reweighing the evidence, whether there was sufficient evidence to permit a rational jury to convict. (*Salgado*, *supra*, 88 Cal.App.4th at p. 15.) A trial court's postconviction dismissal of

28

a jury's verdict based on insufficiency of evidence is an appealable order. Judgment may be entered on the underlying jury verdict without violating state or federal prohibitions against double jeopardy. (*Id.* at pp. 7-8.)

By contrast, if the jury has not been able to reach a verdict and the trial court rules the evidence is insufficient as a matter of law to sustain a conviction, double jeopardy bars retrial even if the court's ruling is patently erroneous or the court has no statutory authority to make it. (*Hatch*, *supra*, 22 Cal.4th at pp. 270-271; see *Sanabria v. United States, supra,* 437 U.S. at p. 75 [there is no exception permitting retrial once the defendant has been acquitted, no matter if the acquittal is egregiously erroneous].) However, if a defendant seeks termination of the proceedings against him on a basis unrelated to his factual guilt or innocence, double jeopardy does not preclude the government from appealing the dismissal and does not bar appellate review. (*Evans*, *supra*, 133 S.Ct. at p. 1075, citing *United States v. Scott* (1978) 437 U.S. 82, 99 (*Scott*).)

B

*Issues of General Applicability*

Many of the issues raised in this appeal are specific to the criminal charge involving a particular victim. To avoid repetition, we first address two issues the parties raise throughout their briefing.

1.      *The dismissals are not invalid solely because the trial court did not invoke section 1385*

The People claim section 1385 is the only legal authority that permits a trial court to dismiss a count after the case is submitted to the jury. (*Porter*, *supra*, 47 Cal.4th at p. 133 [trial court has no authority to grant an acquittal in connection with a § 1181 motion]; *Hatch*,

29

*supra*, 22 Cal.4th at p. 269 [section 1385 permits dismissals for legal insufficiency of the evidence after the case is submitted to the jury].)  Relying on *Hatch*, the People argue the dismissals are procedurally invalid because in all but two rulings (see Discussion, pt. IV.B, *post*), the trial court either explicitly stated it was not dismissing the counts pursuant to section 1385 or did not reference section 1385 in its remarks or minute orders.

The People misconstrue *Hatch*.  The central issue in *Hatch* is whether the constitutional prohibitions against double jeopardy bar retrial after a dismissal under section 1385.  (*Hatch*, *supra*, 22 Cal.4th at p. 263.)  The case does not address whether section 1385 is the sole authority for dismissal after the case has been submitted to a jury.  Relying on United States Supreme Court precedent, *Hatch* states that an acquittal for double jeopardy purposes is not controlled by the form of the judge's action.  (*Hatch,* at p. 270, citing *United States v. Martin Linen Supply Co.* (1977) 430 U.S. 564, 571.)  "Rather, appellate courts 'must determine whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.' "  (*Hatch,* at p. 270, quoting *Martin Linen Co.*, at p. 571.)

The trial court's apparent misunderstanding of its authority to dismiss for legal insufficiency of the evidence under section 1385 does not control our analysis.  A defect in the form of the motion should not be construed to undermine the trial court's duty to protect the fundamental rights of the accused.  (*Fosselman*, *supra*, 33 Cal.3d at p. 582.)  A dismissal will be upheld if the record establishes that all the conditions required under section 1385 are satisfied.  (*Salgado*, *supra*, 88 Cal.App.4th at pp. 9-10.)  The trial court's disavowal of section 1385 is not dispositive of the issue.  Instead, we review the record to determine whether it

30

clearly shows that the trial court viewed the evidence in the light most favorable to the prosecution and concluded that no reasonable trier of fact could find guilt beyond a reasonable doubt. (*Hatch*, *supra*, 22 Cal.4th at p. 273.)

2. *We need not consider respondents' claim that double jeopardy bars appellate review of counts of conviction after a grant of new trial*

Appellate review of dismissal of convictions does not implicate double jeopardy. (*Evans*, *supra*, 133 S.Ct. at p. 1081, fn. 9 [on a conviction, there is no double jeopardy barrier to an appeal by the government from the court's acquittal because reversal would result in reinstatement of the jury verdict of guilt, not a new trial].) Respondents argue the grant of their new trial motions on the commodities fraud counts renders their convictions on those charges the functional equivalent of acquittal; therefore review of the dismissal of those counts is barred by double jeopardy. Because we have concluded that the trial court erred when it granted defendants' motions for new trial on grounds of instructional error on the commodities fraud counts, we need not address respondents' argument concerning the application of double jeopardy to defendants' convictions for commodities fraud.

III

DISMISSAL OF CONVICTIONS

A

*The Trial Court Erred When It Dismissed the Defendants' Convictions on Count Nine (Commodities Fraud, Robert Smith)*

1. *The trial court's ruling*

The trial court ruled that Corporations Code section 29536 requires the prosecution to show that "the actual victim" relied on a defendant's material misrepresentation and does not

permit conviction on an agency theory. The trial court then found that the testimony of Robert's agent, Smith, was insufficient as a matter of law to establish that Robert relied on any material misrepresentation by the defendants. The trial court reasoned that Robert did not testify; therefore there was no evidence to show he relied on any untrue material statement by the defendants in deciding to invest. The trial court also concluded that any misrepresentations the defendants made to Smith were irrelevant because Robert signed an agreement with Kingdom Advisors containing an advisement stating his investment was at risk. In dismissing the defendants' convictions on count nine, the trial court explicitly stated it was *not* acting pursuant to section 1385.[18]

2.      *The parties' contentions*

The People contend the trial court erred as a matter of law by requiring the "actual victim" to testify to prove he relied on the defendants' untrue material statement or omission. They argue the plain language of Corporations Code section 29536 requires only that a defendant make a materially false statement or omit to state a material fact "in connection with" a commodities transaction, and does not require proof the victim relied on a material fact or omission. (Cf. *Lynch v. Cook* (1983) 148 Cal.App.3d 1072, 1081-1082, overruled on other grounds by *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130.) The People contend materiality is an objective test involving the importance of the misrepresented or omitted material fact to a reasonable investor, and does not require the prosecution to prove that the

---

[18]      The minute order states "Motion to dismiss count [nine] as to Mr. Romero and Mr. Martinez due to insufficiency of evidence is **granted**." The record transcript reflects that the trial court dismissed count nine as to "Lee, Romero and Martinez." The omission of Lee's name from the minute order appears to be clerical error.

32

actual investor considered the misrepresentation or omission to be important. (*Lynch,* at pp. 1081-1082.)

Respondents contend a misrepresentation in the sale or offer of commodities must be material to a reasonable investor in the same position as the named victim. Relying on an affirmative claim of self-defense in a battered woman's case, they assert that an objective standard of reasonableness refers to a " 'reasonable person in a similar situation and with similar knowledge.' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083.) Thus, the jury was required to consider whether any misrepresentations were material to an investor who was prepared to lose $100,000 on a speculative investment. Respondents argue there is no evidence to show that the alleged misrepresentations were material to Robert, who was looking for "a very aggressive instrument" and decided to make a speculative investment in the defendants' forex trading scheme.

3.      *Standard of review*

When an appeal presents a pure issue of law, we exercise our independent judgment, giving no deference to the trial court's ruling. Where the facts are not disputed, the effect or legal significance of the facts is a question of law, and we are free to draw our own conclusions, independent of the ruling by the trial court. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.)

In any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent in implementing the law. (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) We look first to the language of the statute, giving effect and significance to every word and phrase. (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1284.) We presume the

33

Legislature intended every word, phrase and provision in a statute to have meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476.) If there is no ambiguity in the language of the statute, the Legislature is presumed to have meant what it said, and the plain meaning of the language governs. (*Lennane v. Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268.)

4.      *Analysis*

Corporations Code section 29536 states it is unlawful for any person, *directly or indirectly*, in connection with the purchase or sale of, or the offer to buy or sell, a commodity, commodity contract, or commodity option, "[t]o willfully make any false report, enter any false record, make any untrue statement of a material fact, or omit to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading." (*Id*., subd. (b).) We give the words of a statute their ordinary and usual meaning and construe them in the context of the statute as a whole. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) By its plain terms, a person violates section 29536, subdivision (b) by making a false statement directly to the victim, or indirectly to the victim through another party, in connection with the purchase or sale of, or the offer to buy or sell, a commodity, commodity contract, or commodity option.

Corporations Code section 29536 does not require the fact finder to consider the importance of the misrepresented or omitted material fact to "the actual victim." "The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor. Variations in the formulation of a general test of materiality occur in the articulation of just how significant a fact must be or, put another way, how certain it must be that the fact would affect a reasonable investor's

34

judgment." (*TSC Industries, Inc. v. Northway, Inc.* (1976) 426 U.S. 438, 445; *Lynch v. Cook, supra,* 148 Cal.App.3d at pp. 1081-1082 [under federal securities statutes and regulations prohibiting the issuance of materially misleading proxy statements, question of materiality is an objective one, involving the significance of omitted or misrepresented fact to reasonable investor]; *United States v. Reyes* (9th Cir. 2009) 577 F.3d 1069, 1075 [standard of materiality is judged from the perspective of a reasonable investor and is therefore objective].)

The testimony of the "actual victim" is not required where other evidence establishes the defendant's misleading statements or omissions and the victim's reliance on those statements. (*Butler, supra,* 212 Cal.App.4th at p. 404.) In *Butler*, the defendant was charged with hundreds of counts of securities fraud, tax fraud and theft in a scheme targeting elderly investors, many of whom were dead at the time of trial or could not remember what was communicated to them about the promissory notes they received in exchange for their money. (*Id.* at p. 419.) On appeal, the defendant challenged those convictions that were primarily based on a note that each victim signed, without evidence from the corresponding victim that specific misrepresentations of existing fact or omissions were made in connection with the existence of the note. Other victims testified about the promised return of 12 percent and the lack of any disclosure about the defendant's negative history of business dealings. (*Ibid.*)

The reviewing court concluded that the evidence was sufficient to support the defendant's convictions on 288 counts of securities fraud under Corporations Code section 25401 even though many of the victims did not testify. (*Butler*, *supra*, 212 Cal.App.4th at pp. 419, 424.) There was substantial evidence to show that the defendant had promised to pay investors 12 percent interest and return their principal, and did not make sufficient disclosures

35

to them to make his statements not misleading. The promissory notes that each victim signed were admitted into evidence. In addition, other victims testified about the defendant's misleading statements and lack of disclosures. Thus there was substantial evidence to show that the defendant "consistently omitted material facts to all victims, not just those fortunate enough to have survived to testify . . . ." (*Id.* at p. 424.)

Here, Smith testified Romero and Martinez represented that they could provide a monthly return of six percent and that they currently had clients who were earning that rate. Smith also thoroughly discussed stop-loss as risk mitigation with Lee. Smith recommended that Robert invest with the defendants based on the protection afforded to his principal and the very high rate of return. The defendants knew that Smith was a financial advisor who was seeking investment opportunities for his clients. The defendants misrepresented the rates of return, their current success trading forex, risk mitigation and principal protection—all material misstatements. A reasonable jury could conclude there was sufficient evidence to establish that the defendants made misleading statements and the victim relied on those statements. (*Butler*, *supra*, 212 Cal.App.4th at p. 419.)

The trial court also erred when it concluded that any material misstatements that were made to Smith were irrelevant because the contract Robert signed with the defendants contained an advisory that his funds were at risk. A reasonable jury could conclude that the contract provisions did not disclose the actual material facts of the defendants' forex trading scheme, i.e., that the use of a stop-loss could not be effectively implemented in forex trading. (See *IFS, Inc., supra,* 323 F.Supp.2d at pp. 501-502, 499-500, 503 [even if customers read, signed, and understood the risk disclosure and customer account statements, those documents

do not disclose the *actual* material facts that the company's trading practices maximized its commissions at the expense of clients' investments]; *Clayton Brokerage Co. v. CFTC* (11th Cir.1986) 794 F.2d 573, 580 [oral representations may effectively nullify warnings in a risk disclosure statement by discounting its general significance and relevance to the customer's particular situation]; *CFTC v. R.J. Fitzgerald & Co.* (11th Cir. 2002) 310 F.3d 1321, 1329-1330 [statements that lead a customer to believe that a particular investment is low risk are not protected from claims of fraud simply because the broker made a *pro forma* disclosure of risk].)  The record clearly shows that the defendants did not inform Smith that other clients had lost large sums of money in forex trading and that stop-loss mechanisms were not effective in protecting principal, and instead described their stop-loss and notification mechanisms with assurances that those mechanisms would protect the client's principal.  (See *Butler*, *supra*, 212 Cal.App.4th at p. 424.)

We conclude that the trial court misinterpreted Corporations Code section 29536, subdivision (b), and therefore abused its discretion in dismissing the defendants' convictions on count nine for insufficiency of the evidence.

B

*The Trial Court Erred When It Dismissed Martinez's Conviction on Count Eleven*
(*Commodities Fraud, Smith*)

1. *The trial court's ruling*

In dismissing Martinez's conviction on count eleven, the trial court stated "the record was void" of any evidence showing that Martinez made any materially false statements to Smith.  The trial court said, " . . . I've gone through the record once again, and I don't see anything."  The prosecutor then described the statements Martinez made to Smith concerning

37

stop-loss protection and rates of return. The trial court responded, "When [Smith] was crossed on that, he backed off of that. So we're back on . . . sufficiency . . . basically, I can assess [Smith's] credibility and what statements he made." The trial court found that Martinez could not be convicted merely because he was present at meetings between Smith and Romero and Lee. Smith testified Martinez did not make any misrepresentations to him. The trial court said, "I look at the record and . . . I don't see [any material misrepresentations by Martinez]. I just don't see it in the record. [¶] . . . [¶] So I find there is in fact insufficient evidence to support count [eleven] as to Mr. Martinez, and that count is also dismissed."

2.      *The parties' contentions*

The People contend the dismissal of count eleven was defective because trial court did not review the record for substantial evidence to support the jury's verdict. The People also challenge the court's finding there is no evidence in the record to show that Martinez made any materially false statement to Brian Smith.

Martinez argues the trial court correctly applied the substantial evidence test. He contends that not only is the evidence insufficient to show his guilt, it proves his innocence.

3.      *Legal principles and standard of review*

Section 1385 dismissals "should not be construed as an acquittal for legal insufficiency unless the record clearly indicates that the trial court applied the substantial evidence standard." (*Hatch*, *supra*, 22 Cal.4th at p. 273.) "Absent such a showing, we will assume the court did *not* intend to dismiss for legal insufficiency and foreclose reprosecution." (*Ibid*.) We review the trial court's ruling to determine whether it is "clear enough for reviewing courts to confidently conclude [it] viewed the evidence in the light most favorable to the prosecution and

found that no reasonable trier of fact could convict." (*Ibid*.) Absent a clear showing the trial court applied the substantial evidence standard of review, we will assume the court did not intend to dismiss for legal insufficiency and bar retrial. (*Ibid.*)

4.     *Analysis*

The record does not clearly show that the trial court applied the substantial evidence standard. (*Hatch*, *supra*, 22 Cal.4th at p. 273.) To the contrary, the trial court's remarks about its ability to determine the credibility of witnesses and its disregard of Smith's testimony on direct in favor of his more ambiguous statements during cross-examination indicate the trial court was reviewing the evidence as a thirteenth juror. The trial court's finding that Martinez did not make any untrue statement of material fact to Smith is not supported by the record.

In late 2004 or early 2005, Smith met with Romero and Martinez to discuss their forex trading program. This was after Kingdom Advisors's initial period of success. Martinez was aware that the company's trading success, which began in approximately April 2004, lasted only three to four months and that the initial investors ultimately lost money. Romero said they could provide a monthly return of six percent. They had clients who were earning that rate. Martinez echoed his remarks, telling Smith "there was profitability in their venture; they could provide seven percent a month with a lot of safety on the principal." Romero did most of the talking during the meeting. Martinez would echo and amplify Romero's remarks. At a later meeting, Romero told Smith they were actively trading and it was exciting and profitable. Martinez supported Romero's representations. Later, Smith met with Lee, Romero and Martinez to discuss the mechanics of principal protection in greater detail. Smith did not recall Martinez saying "much of anything" during that meeting. Robert invested $100,000 with

39

Kingdom Advisors in November 2004, which was commingled in a trading account with other investor funds. Martinez advised Smith about the trading success or status of his accounts. After Robert's account suffered large losses, Romero assured Smith that Robert's principal was intact and if he kept trading, profits would resume. Smith spoke to Martinez several times during this period. Martinez did not respond to Smith's inquiries. The record shows that Kingdom Advisors withdrew the funds remaining in the trading account. In March 2005, Martinez received $26,000 of those funds.

Further, a violation of Corporations Code section 29536, subdivision (b) not only occurs when a person makes a materially false statement, it also occurs when a person "omits to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading." The record shows that by September 2004, before he met with Smith, Martinez knew the defendants' forex trading venture was not profitable and other investors had lost substantial sums of money. At the first meeting with Smith, Martinez "echoed" rather than corrected Romero's remarks about their success in forex trading, use of stop-loss mechanisms and protection of principal. Martinez was present when Lee and Romero made numerous material misrepresentations to Smith about their success in forex trading and use of stop-loss mechanisms to protect the investor's principal. Martinez did not advise Smith that earlier investors had in fact lost significant sums of money. After Smith became aware that his accounts had suffered significant losses and Romero was encouraging him to continue to trade, Martinez would not provide any explanation to Smith, even when asked. Smith never learned what happened to his clients' funds. Later, Martinez advised a

40

friend to withdraw his investment in TradeCo but did not give any similar advice or information to Smith, who was a business client.

The record contains substantial evidence to show that Martinez willfully made untrue statements of a material fact to Smith and omitted to state material facts necessary to make his codefendants' statements, in light of the circumstances under which they were made, not misleading. Thus, the requirements for dismissal on legal insufficiency of the evidence are not met. (*Salgado*, *supra*, 88 Cal.App.4th at pp. 9-10 [a dismissal will be upheld only if the record establishes that all the conditions required under section 1385 are satisfied].) To the extent the trial court was ruling as a thirteenth juror under section 1181(6), the record does not support its finding that "the record was void" of any evidence to show that Martinez made any materially false statements to Smith. Further, the trial court erred when it considered only whether Martinez had made a material misrepresentation to Smith and did not consider whether Martinez omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. (Corp. Code, § 29536, subd. (b).)

C

*The Trial Court Erred When It Dismissed Lee's and Romero's Convictions on*
*Count Thirteen (Commodities Fraud, Lutz)*

1.     *The trial court's rulings*

The trial court dismissed count thirteen for insufficiency of the evidence.[19] The trial court stated that Lutz's testimony focused on Lee's and Romero's misrepresentations concerning the implementation of stop-loss protections. The contract between Lutz and Lee

---

[19]     The minute order states: "The Court dismisses **Count [thirteen]** as to all defendants due to insufficiency of the evidence as fully noted on the record." The reference to "all defendants" appears to be clerical error; Martinez was not charged with count thirteen.

and Romero stated the stop-loss mechanisms were to occur on a per trade basis. The trial court reasoned that the losses could have been caused by small transactions, none of which individually exceeded the stop-loss provision of 80 percent of value. In addition, Lee notified Lutz when his losses were at 21 percent. At that point, Lutz and Lee renegotiated everything. The trial court said Lutz was getting greedy. He wanted his money back. Lutz gave Lee almost carte blanche to trade. Lutz testified the defendants lied to him about stop-loss. The sequence of events did not bear that out. The trial court ruled there was no evidence to show that the stop-loss provisions in the private placement memo were violated by the defendants and therefore, the defendants did not make any false statements of material fact to Lutz.

2.      *The parties' contentions*

The People contend the trial court abused its discretion when it found that the defendants did not make any misrepresentations to Lutz. They argue the trial court unreasonably disregarded Lutz's testimony concerning Lee's and Romero's material misrepresentations to him and instead limited its analysis to the parties' written contract. The People also point out the trial court made a math error when it said Lutz was notified when his account balance reached approximately 20 percent of its last valuation.

Respondents argue the trial court dismissed count thirteen for insufficiency of the evidence and correctly reviewed the record for substantial evidence. They acknowledge the trial court's math calculation was erroneous.

3.      *Analysis*

The record does not show that the trial court applied the substantial evidence standard of review in reaching the conclusion that the evidence was insufficient to sustain the guilty

42

verdict. (*Hatch*, *supra*, 22 Cal.4th at p. 273.)  Instead, the record clearly shows the trial court disagreed with the jury's resolution of conflicting evidence and concluded that the guilty verdicts were against the weight of the evidence.  In addition, the trial court erred as a matter of law when it concluded that the written contract was more significant than Romero's and Lee's material misstatements to Lutz.  (*IFS, Inc., supra*, 323 F.Supp.2d at pp. 499-503.)

The record shows that Romero and Lee told Lutz they had an established stop-loss policy to stop trading if any account had a 20 percent loss below the most recent highest asset valuation.  Lutz believed that trading would stop and he would be notified if his accounts dropped below 20 percent of their original amount.  He believed that losing 20 percent was "the worst case" scenario.  After being informed of some initial success, Lutz was not notified until his accounts had lost approximately 40 to 50 percent of their value.  When Lee represented that he had some safer, small trades that would bring the account balances back to their original amounts, Lutz authorized Lee to continue trading.  After Lutz repeatedly requested an update on the value of his accounts, Lee informed Lutz that his account balance had lost more than 30 percent of its original value.  On October 12, 2005, Lutz told Lee to close the account and return the balance of $105,378.89 to him.  On November 4, Lee notified Lutz that his account had lost approximately 90 percent of its original value.  Lee and Romero took commissions and fees from trading Lutz's funds, which are reflected in the loss of approximately $248,300.

The record shows that Romero and Lee repeatedly informed Lutz he would not lose more than 20 percent of the amount of his original investment and that he would be informed when his losses reached 20 percent of his original investment amount.  Lutz testified he

43

"hounded [Lee] daily" for the status of his account. Lutz relied on Lee's and Romero's representations to him in deciding to invest. The jury could reasonably conclude that Lee and Romero violated Corporations Code section 29536 when they told Lutz that their stop-loss mechanism and notification procedure would protect 80 percent of his principal.

Viewed in the light most favorable to the prosecution and drawing all inferences in favor of the jury's verdicts on count thirteen, there is substantial evidence to support Lee's and Romero's conviction for defrauding Lutz in violation of Corporations Code section 29536, subdivision (b). We conclude the trial court erred by not applying the substantial evidence standard when it dismissed count thirteen for insufficiency of the evidence.

D

*The Trial Court Erred When It Dismissed Romero's Conviction on Count Eight*
*(Grand Theft, Robert Smith)*

1. *The trial court's ruling*

The trial court determined there was insufficient evidence to support count eight on a theory of either theft-by-trick or embezzlement. The elements of theft-by-trick are: " '(1) the obtaining of the possession of the property of another by some trick or device; (2) the intent by the person so obtaining possession to convert it to his own use and to permanently deprive the owner of it; and (3) that the owner, although parting with possession to such person, does not intend to transfer his title to that person.' " (*People v. Traster* (2003) 111 Cal.App.4th 1377, 1390.) Obtaining the owner's consent to use the property for a specified purpose while intending to use it in a different way constitutes fraud or deceit. (CALCRIM No. 1805.)

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been [e]ntrusted." (§ 503.) The elements of embezzlement are (1) the owner entrusted his

44

property to defendant; (2) the owner did so because he trusted the defendant; (3) the defendant fraudulently converted that property for his own benefit; and (4) when the defendant converted the property, he/she intended to deprive the owner of its use. (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 636.) "[A] finding by the jury that the money was originally obtained in good faith and that defendant later developed a design to appropriate the money for his own use would support his conviction under the theory of embezzlement." (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 797.) " 'An intent to deprive the rightful owner of possession even temporarily is sufficient and it is no defense that the perpetrator intended to restore the property nor that the property was never "applied to the embezzler's personal use or benefit." [Citations.]' (*In re Basinger* (1988) 45 Cal.3d 1348, 1363-1364.)" (*People v. Nazary* (2010) 191 Cal.App.4th 727, 742.)

The trial court concluded that the evidence was insufficient to sustain Romero's conviction on count eight on a theft-by-trick theory because the evidence showed that Romero obtained and used Robert's funds for the "specified purpose" of investing in forex and was insufficient to show theft or deceit. The trial court rejected the People's argument that clients transferred funds to the defendants for forex trading only because the clients accepted the defendants' fraudulent representations concerning stop-loss, safety of principal and rates of return. The trial court said the elements of embezzlement were not satisfied because the People did not meet its burden to "do dollar-for-dollar tracing" to show that any of Robert's funds were converted to Romero's personal use. All of Robert's funds may have been lost in trading.

In dismissing count eight, the trial court said:

" . . . [T]he reason . . . I've tried to make a very detailed record and try to basically, you know, account for every single theory and every fact that we can, because -- and even though, frankly, I -- you know, believe that what the Court has done is factually and legally correct, appellate courts could disagree. [¶] [W]e have hung counts that were dismissed on insufficiency or legal bases, and we have counts of conviction dismissed, insufficiency or legal bases. . . .[¶] . . . [¶] . . . It seems like we need an appellate court to sort of weigh in because, if there's going to be -- not that I'm advocating [for] it -- if there's a retrial, what I'm saying is that, you know, guidance -- what does, -- 'Court you messed up. So these hung counts, no, they still exist. These counts you dismissed, you know, on your legal theory, no; we're reversing you. They exist.' And so I think everybody almost needs to know [before proceeding to a retrial] -- to me, it's like one of these cases where it's ripe for appellate review. . . . If there was really going to be a retrial, it wouldn't make any sense to do a retrial on limited counts -- [¶] . . . [¶] -- only to find that out the appellate court reversed and sent it back, and you're going to have to do another trial."

The trial court's minute order states: "The Court finds that **Count [eight] is dismissed** as to Mr. Lee and Mr. Martinez due to insufficiency of the evidence as fully noted on the record."[20]

2.      *The parties' contentions*

The People contend the trial court did not review the record for substantial evidence. They argue the trial court abused its discretion when it determined there was no evidence that Robert's money had been procured by fraud or deceit because it was used for forex trading, its intended purpose, and that embezzlement was not a viable theory of liability because the People did not prove that any of Robert's money was converted to Romero's personal use.

---

[20]      The record shows the following exchanges between the trial court and attorneys: Romero's attorney: "So count [eight] is dismissed for lack of sufficient evidence?" Court: "Yes." Lee's attorney: "That also goes to Mr. Lee; correct?" Court: "Everybody. That was a hung count as to Mr. Lee and Mr. Martinez." The omission of Romero from the minute order appears to be clerical error. We discuss the dismissal of count eight as to Lee and Martinez in Discussion, part IV.C, *post*.

46

Respondents state the trial court properly dismissed count eight because the evidence was legally insufficient to support Romero's conviction. They contend the trial court properly defined "specified purpose" under section 487, subdivision (a). They argue there is no evidence to show that the defendants converted any of Robert's funds for their personal use. There was no forensic tracing of the trading account in which his funds were commingled, and there was no evidence to show that the defendants were not legitimately entitled to the withdrawn funds. Respondents further argue that even if the trial court erred when it determined there was insufficient evidence to support Romero's conviction on count eight, the guilty verdict should not be reinstated. Instead, the matter should be remanded to the trial court to rule on the motion for a new trial under section 1181(6).

3.      *Analysis*

The record does not clearly show that the trial court intended to dismiss for legal insufficiency and bar retrial. (*Hatch*, *supra*, 22 Cal.4th at p. 273.) Not only did the trial court discuss the possibility of retrial in its discussion on count eight, it did not review the evidence in the light most favorable to the prosecution. (*Ibid*.)

The record shows that in November 2004, Robert invested $100,000 with Kingdom Advisors. His funds were commingled in a Kingdom Advisors trading account. The total initial balance was $478,385. There were trading losses of $149,630.50. Lee withdrew the remaining balance of $328,754.50 and transferred $53,000 to Romero's personal bank account. Romero continued to represent to Smith that Robert's principal was intact. Kingdom Advisors made a $5,000 payment to Robert after the balance of the account was withdrawn and trading ceased. Those funds came from another investor's account.

47

Even were we to accept the trial court's finding that the evidence was insufficient to show the defendants initially obtained Robert's property by fraud or deceit, the record shows that after defendants stopped trading on the account, Romero continued to represent that Robert's principal was intact and profits would resume. A jury could reasonably infer that had all of Robert's funds been lost in trading, Romero would not have made any additional payments to him. When the remaining funds were withdrawn from the trading account, the funds were no longer being used for their specified purpose, forex trading, but instead were transferred to the defendants and used for their business and personal expenses. A reasonable jury could conclude that the defendants fraudulently or deceitfully obtained Robert's money when they stopped trading, assured Smith the funds were intact and trading would again become profitable, and withdrew the remaining funds from the account for their own use.

The trial court's imposition of a requirement of "dollar-for-dollar tracing" to prove embezzlement is untenable. Money credits are fungible and lose their separate identity once commingled in an account. (*People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 168.) We do not interpret the statutory definition of embezzlement as allowing individuals to avoid prosecution simply by commingling funds. Not only did Romero assert that Robert's principal was intact, a jury could draw a reasonable inference that Robert was entitled to a pro rata share of the commingled funds. We also reject respondents' argument the defendants may have been legitimately entitled to the withdrawn funds. Based on the evidence that was presented about the defendants' methods of operation and the tracing of the commingled funds to their personal bank accounts, a reasonable jury could find that the defendants converted the remaining funds to their own benefit, with intent to deprive the owner of the property.

48

The trial court's remarks about a possible retrial indicate it did not intend to acquit Romero on count eight. Absent a clear showing of the trial court's intent, we cannot conclude the trial court intended to dismiss the count and bar retrial. (*Hatch*, *supra*, 22 Cal.4th at p. 273.) To the extent the trial court granted a new trial on count eight, we conclude that the court abused its discretion when it found that there was insufficient evidence to show that the defendants did not use Robert's money for its specified purpose and that "dollar-for-dollar" tracing of fungible monetary credit was required to prove conversion.

E

*The Trial Court Erred When It Dismissed Lee's and Romero's Convictions on Count Twelve (Grand Theft, Lutz)*

1.  *The trial court's ruling*

The trial court dismissed Lee's and Romero's convictions on count twelve, concluding there was no evidence to show fraud or deceit because Lutz's funds were used for the specified purpose of forex trading. (See Discussion, pt. III.D, *ante*.) In addition, commensurate with its findings on commodities fraud (Lutz) (see Discussion, pt. III.B, *ante*), the trial court determined that Lee and Romero did not misrepresent the stop-loss provisions to Lutz.

The minute order states: "As it pertains to count [twelve], the Court finds the plain language in the instructions in this case as to theft. The purpose of the money was to be used in the foreign exchange market. There was no violation loss as to the stop[-]loss provision. The court **dismisses Count [twelve]**, as to all defendants,[21] as fully noted on the record."

---

21     Martinez was not charged with count twelve.

2. *The parties' contentions*

The People argue the trial court did not review the record in the light most favorable to the prosecution. They contend the trial court erred when it determined Lutz's funds were used for the specified purpose of forex trading when the funds were first deposited in the trading account. The People maintain the trial court should have reviewed the entire record to determine whether Lee's and Romero's representations to Lutz about the manner of trading were fraudulent or deceitful. The evidence shows that Lee and Romero enjoyed tremendous financial benefits from trading the Lutz funds, withdrawing more than $200,000 from the accounts in which the Lutz funds were traded. The People contend the trial court erred when it disregarded Lutz's testimony about Lee's and Romero's misrepresentations to him, and instead found that the stop-loss contract provisions controlled its analysis.

Respondents argue the trial court properly dismissed counts twelve on the grounds the evidence was legally insufficient to support a guilty verdict. The evidence showed that all of Lutz's principal was lost through forex trading or was returned to him.

3. *Analysis*

The record shows the trial court did not review the evidence in the light most favorable to the prosecution. There is substantial evidence to show that Lee and Romero knowingly deprived Lutz of his money by false or fraudulent representation or pretense, and converted some of his funds to their own use. (§ 487, subd. (a).) Lee and Romero persuaded Lutz that they could manage risk through stop-loss mechanisms. They were aware that stop-loss mechanisms were ineffective in managing risk in forex trading. Lee disregarded Lutz's instructions to close his accounts when the balances totaled approximately $105,000 and

50

continued to trade until those accounts had lost more than 90 percent of their initial value. Lutz's losses included commissions and fees that were paid to Lee and Romero. A reasonable jury could conclude that Lee and Romero fraudulently set up a scheme in which they could make money on each trade, while encouraging the investor to continue to trade as long as possible to recoup losses, in a design to appropriate whatever funds they could for their own use. (*People v. Cuccia*, *supra*, 97 Cal.App.4th at p. 797.) We conclude that the trial court erred in dismissing Lee's and Romero's convictions on count twelve.

IV

DISMISSAL OF DEADLOCKED COUNTS

A

*The Trial Court Erred When It Dismissed the Shemtov-Younessi Counts*

1. *The trial court's rulings*

At the close of the People's evidence, Lee and Romero made a motion to dismiss the Shemtov-Younessi counts, arguing the People failed to show the charges were filed within the four-year statute of limitations. At that time, the trial court denied the requests to dismiss the counts, stating there was substantial evidence to show that the victims, as reasonable persons, would not have discovered the criminal nature of their dealings with Lee and Romero until they filed a complaint with the Department of Corporations, and therefore it was a question for the jury.

During its deliberations, the jury sent a note to the trial court stating it could not reach agreement on whether the charges were filed within the statute of limitations and asking whether it should proceed to determine whether defendants Lee and Romero were guilty of the

51

substantive offenses. The trial court instructed the jury that if it were unable to reach a unanimous verdict on any count involving the statute of limitations, it did not need to deliberate on the substantive issues on those counts. The jury did not return verdicts on the Shemtov-Younessi counts.

In discussing its dismissal of the Shemtov-Younessi counts, the trial court said it had been concerned about the statute of limitations early in the case but had decided to let the issue go to the jury. Now, with the jury's deadlock in mind, the trial court dismissed the Shemtov-Younessi counts, stating it was "very clear to the Court" that the victims discovered or should have discovered the crimes in August 2004, when they learned their investments had lost more than half their value. The trial court explicitly stated it was not ruling under section 1385 but "on the issue of sufficiency." The trial court's minute order states, "Motion to dismiss counts [two], [three], [four] and [five] as to Mr. Lee, and counts [two] and [three] as to Mr. Romero is **granted** due to insufficiency of the evidence."

2.      *The parties' contentions*

The People contend the trial court erred when it dismissed the Shemtov-Younessi counts. They argue the use of the phrases "from the court's perspective" and "it's very clear to the Court" indicates that the trial court was making its own evaluation of the facts and drawing its own factual conclusions instead of examining the evidence in the light most favorable to the prosecution.

52

Respondents contend the trial court dismissed counts two and three[22] for legal insufficiency and therefore double jeopardy prohibits appellate review. They argue the dismissal met the requirements of section 1385 and the trial court's colloquial language does not show the court reweighed the evidence as a thirteenth juror. Respondents acknowledge the trial court misunderstood its authority under section 1385 to dismiss for legal insufficiency and instead believed section 1385 applied only when the court made findings "in the furtherance of justice" and that a dismissal for insufficiency was made under separate authority.

3.     *Analysis*

If a defendant seeks termination of the proceedings against him on a basis unrelated to his factual guilt or innocence, double jeopardy does not bar appellate review. (*Evans*, *supra*, 133 S.Ct. at p. 1075, citing *Scott*, *supra*, 437 U.S. at p. 99.) The issue whether the Shemtov-Younessi charges were filed within the statute of limitations does not go to the factual guilt or innocence of the defendants. A defendant is acquitted only when the judge's ruling actually represents a resolution in defendant's favor, correct or not, of some or all of the factual elements of the offense charged. (*Scott*, *supra*, 437 U.S. at p. 97.) Thus double jeopardy does not bar appellate review of the Shemtov-Younessi counts. (*Evans*, *supra*, 133 S.Ct. at p. 1075.)

The record does not clearly indicate the trial court applied the substantial evidence standard. (*Hatch, supra,* 22 Cal.4th at p. 273.) Absent such a showing, we will assume the trial court did not intend to dismiss for insufficiency of the evidence. (*Ibid.*) Viewing the record in the light most favorable to the prosecution, we conclude there is substantial evidence

---

[22]     Romero and Martinez were not charged with counts four and five. However, our analysis of counts two and three also applies to counts four and five.

to support the People's theory that Shemtov and Younessi did not learn they were victims of commodities fraud and grand theft until they filed a complaint with the CDC in May 2005. (See § 803, subd. (c) [statute of limitations is tolled until the discovery of an offense in which fraud is a material element].) "[T]he discovery of a loss by the victim *alone* is insufficient to trigger the running of the limitations period: 'Literally, . . . discovery of a loss, without discovery of a criminal agency, is not enough.' [Citation.]" (*People v. Soni* (2005) 134 Cal.App.4th 1510, 1518.)

When Shemtov and Younessi first learned of the losses, they sought explanations from Lee and Romero. Lee said the losses were the result of a bad decision on one trade. Romero promised to reimburse Shemtov and sent $2,000 to him. Shemtov did not take any action until Romero and Lee refused to compensate him. Lee told Younessi that the loss was "one of those things that happens once in a century." Younessi believed he had made a stupid business decision. He did not view himself as the victim of a crime.

In *Soni*, a division of this court held that where the victim pursued explanation for financial discrepancies that came to her attention over the course of several months, the discovery of the crime occurred on the date she released the information to the authorities. (*People v. Soni*, *supra*, 134 Cal.App.4th at p. 1518.) Similarly, a jury could reasonably conclude that Shemtov and Younessi sought explanations from Romero and Lee about the nature of their losses and were initially misled, and did not discover they had been the victims of crimes until they filed a complaint with the CDC. We conclude that the trial court erred when it dismissed the Shemtov-Younessi counts for insufficiency of the evidence.

54

*The Trial Court Abused Its Discretion When It Dismissed Count One (Conspiracy) and Count Ten (Grand Theft, Smith) as to Martinez under Section 1385*

1.      *The trial court's rulings*

Martinez asked the trial court to dismiss the deadlocked counts against him as against the weight of the evidence and because it was "the fair thing to [do]" in view of his background and history.  The trial court found that Martinez was a credible witness.  Unlike Lee and Romero, he did not profit from the scheme.  The court adopted "all the arguments made by [Martinez]" and dismissed counts one and ten on the sufficiency of the evidence and in the best interests of justice in view of Martinez's circumstances and the facts of the case.  The minute order states, "As to Defendant **Martinez**:  the Court **DISMISSES** Count **[one]** and **[ten]** due to insufficiency of the evidence."

2.      *The parties' contentions*

The People argue that although the trial court briefly referred to section 1385 in its remarks, the minute order does not reference section 1385 and the dismissal order does not comply with statutory requirements.  They further contend the trial court did not apply the substantial evidence standard of review and the dismissals of counts one and ten were based on an erroneous sufficiency of the evidence analysis.  Alternatively, the People contend the trial court abused its discretion when it dismissed counts one and ten under section 1385 in the interests of justice.

Martinez argues the record transcript clearly shows that the trial court dismissed counts one and ten under section 1385 in the interests of justice and for legal insufficiency of the evidence.  Martinez states the trial court assessed his credibility and determined his testimony

was truthful. He argues this court must defer to the trial court's credibility determinations when supported by substantial evidence.

3.      *Legal principles and standard of review*

The reasons for a dismissal under section 1385 must be set forth in a minute order. (§ 1385, subd. (a); *People v. Bonnetta* (2009) 46 Cal.4th 143, 146 [an order of dismissal is ineffective in the absence of a written statement of reasons entered upon the minutes]; *People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 54 [mandatory requirements have not been met if valid reasons for dismissal are expressed in the reporter's transcript but do not appear in the minutes].) "The trial court's minute order granting a section 1385 motion must contain a written specification of reasons that sets out the factual basis for the trial court's conclusions. [Citation.] The main purpose of this requirement is to restrain judicial discretion and curb arbitrary action for undisclosed motives and reasons. The written specification allows us to determine whether the trial court's stated reasons justified its exercise of discretion." (*People v. Thorbourn* (2004) 121 Cal.App.4th 1083, 1088 (*Thorbourn*).) Review of an order of dismissal under section 1385 is limited to the reasons stated by the trial court. (*Thorbourn*, at p. 1088.)

If the trial court has dismissed a conviction for legal insufficiency of the evidence, the reviewing court engages in precisely the same task as the trial court and determines, without reweighing the evidence, whether there was sufficient evidence to permit a rational jury to convict. (*Salgado*, *supra*, 88 Cal.App.4th at p. 15.) On a dismissal in furtherance of justice, we review the trial court's ruling for dismissal for abuse of discretion. (*Polanski v. Superior Court* (2009) 180 Cal.App.4th 507, 537.) " ' "Discretion is compatible only with decisions

56

'controlled by sound principles of law, . . . free from partiality, not swayed by sympathy or warped by prejudice . . . .' [Citation.]" [Citation.] "[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." ' " (*Ibid.*, quoting *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 (*Alvarez*).)

4.      *Analysis*

The trial court entered only a summary conclusion for the dismissal in the minutes, and did not enter the reasons as required by section section 1385, subdivision (a). (*Thorbourn*, *supra*, 121 Cal.App.4th at p. 1088.) Our review is limited to the reason stated in the minute order. (*Ibid.*) The minute order states the trial court was dismissing counts one and ten for insufficiency of the evidence.

The record does not clearly indicate the court reviewed the record in the light most favorable to the prosecution. (*Hatch, supra,* 22 Cal.4th at p. 273.) Instead, the trial court based the findings on its own determination of credibility. It also found that Martinez's arguments were persuasive and adopted them. This indicates the trial court was acting as a thirteenth juror. Dismissals should not be construed as an acquittal for legal insufficiency unless the record clearly indicates the trial court applied the substantial evidence standard. (*Ibid.*) We reject Martinez's claim the trial court complied with the statutory requirements for dismissal of counts one and ten under section 1385.

Further, to the extent a defect in the form of the dismissal order does not prevent an appellate court from reviewing the trial court's exercise of its duty to protect the fundamental rights of the accused (*Fosselman*, *supra*, 33 Cal.3d at p. 582), we review the trial court's ruling

57

for dismissal in furtherance of justice for abuse of discretion (*Polanski v. Superior Court, supra,* 180 Cal.App.4th at p. 537). The record shows the trial court was impermissibly motivated by sympathy for Martinez. (*Alvarez, supra*, 14 Cal.4th at p. 977.) The fact that Martinez did not benefit from the forex trading scheme to the same extent as Lee or Romero does not absolve him of his actions in furtherance of the scheme. The record shows that Martinez believed he would become Romero's partner in Kingdom Advisors. A reasonable jury could believe Martinez was seeking future gain. With respect to count ten, the record shows that when Martinez and Romero met with Smith about investing in TradeCo, Martinez said they could provide seven percent interest a month while maintaining safety on the principal. Only a portion of Smith's funds were invested in TradeCo. Some of the funds were used to pay a portion of a settlement in a civil lawsuit in which both Romero and Martinez were named defendants.

The record contains evidence from which a jury could reasonably conclude that Martinez was guilty of conspiracy to defraud another of property and grand theft. (§§ 182, subd. (a)(4), 487, subd. (a).) The trial court dismissed counts one and ten as to Martinez because it concluded that Martinez did not benefit from the forex trading scheme to the same extent as his codefendants. (*Alvarez, supra*, 14 Cal.4th at p. 977 [discretion is compatible only with decisions that are controlled by sound principles of law, not swayed by sympathy].) Thus, the trial court's exercise of legal discretion under section 1385 was not grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue. (*Alvarez*, at p. 977.) We conclude the trial court abused its discretion in dismissing counts one and ten under section 1385.

C

*The Trial Court Erred in Dismissing Lee's and Martinez's Charges on Count Eight*
*(Grand Theft, Robert)*

1.     *The trial court's rulings*

The trial court's findings of law and fact with respect to count eight are fully detailed in Discussion, part III.D, *ante*. With respect to Lee and Martinez, the trial court dismissed count eight "due to insufficiency of evidence as fully noted on the record." The trial court noted that it found that Martinez was a credible witness and he was "nothing more than somebody whose name was used by Romero," and whose name was on the forex trading documents only because Romero told him to sign the paperwork.

The trial court said it would like some guidance from an appellate court on its rulings before going forward with any retrial on the deadlocked counts because "the counts that the jury hung on doesn't seem, to be honest with the parties, frankly, to be a good use of taxpayer dollars to go forward on these hung jury counts, and I'm not so sure I would allow it under [section] 1385. I'm not going to necessarily do that right now . . . because, you know, it could end up that . . . the Court gets reversed by the Court of Appeals, and other stuff comes back, and we're back reassessing in this."

2.     *The parties' contentions*

The People argue the trial court erred when it dismissed count eight as to Lee and Martinez because the trial court did not review the record for substantial evidence. In addition, they contend the trial court's remarks concerning appellate review and retrial conclusively show that the court was not ordering an acquittal on the deadlocked count.

59

Martinez replies the trial court correctly determined there was not substantial evidence to support a finding that Martinez made any material misrepresentations to Robert's agent, Smith. He further contends this court must defer to the trial court's finding that Martinez's presentation of himself as an innocent office worker was credible.

3.    *Analysis*

The record does not clearly indicate that the trial court met the requirements of section 1385 when dismissing count eight as to Martinez and Lee. The trial court's statements that it found Martinez to be a credible witness indicate it was viewing the evidence as a thirteenth juror and did not apply the substantial evidence standard of review. (*Hatch*, *supra*, 22 Cal.4th at p. 273 [court must review the evidence in the light most favorable to the prosecution].) Further, the trial court's explicit refusal to dismiss count eight as to either Lee or Martinez under section 1385 and its acknowledgment of a possible retrial strongly indicates that the trial court did not intend to invoke principles of double jeopardy and bar retrial. (*Hatch,* at p. 271.) We conclude that the trial court erred in dismissing count eight as to Lee and Martinez.

DISPOSITION

The orders are reversed and the case is remanded to superior court with instructions to reinstate the verdicts rendered by the jury and sentence the defendants accordingly. The defendants may be retried on the deadlocked counts.[23] On the request of the People, and in the interests of justice, we order that the proceedings on remand be heard before a trial judge

---

[23]    The jury convicted Lee on counts one, nine, eleven, twelve and thirteen. Lee may be retried on counts two, three, four, five, eight and ten. The jury convicted Romero on counts one, eight, nine, ten, eleven, twelve and thirteen. Romero may be retried on counts two and three. The jury convicted Martinez on counts nine and eleven; he may be retried on counts one, eight and ten.

60

other than the judge whose orders were reviewed on appeal.  (Code Civ. Proc., § 170.1, subd.

(c); *People v. Dutra* (2006) 145 Cal.App.4th 1359, 1369.)


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.